## IN THE COURT OF APPEALS OF IOWA

No. 17-0205
Filed April 19, 2017

**IN THE INTEREST OF J.H.,**
**Minor Child,**

**K.S., Mother,**
        Appellant.

_____

Appeal from the Iowa District Court for O'Brien County, David C. Larson, District Associate Judge.

An incarcerated mother appeals the termination of her parental rights to her seven-year-old daughter. **AFFIRMED.**

Katie F. Morgan of Klay, Veldhuizen, Bindner, De Jong & Halverson, P.L.C., Paullina, for appellant mother.

Thomas J. Miller, Attorney General, and Mary A. Triick, Assistant Attorney General, for appellee State.

Shannon L. Sandy of Sandy Law Firm, P.C., Spirit Lake, guardian ad litem for minor child.

Considered by Potterfield, P.J., and Doyle and Tabor, JJ.

**TABOR, Judge.**

A mother, K.S., who was incarcerated at the time of the termination-of-parental-rights hearing, appeals the juvenile court's order severing her legal relationship with her daughter, J.H.[1]  K.S. raises two issues on appeal: (1) the Iowa Department of Human Services (DHS) did not provide reasonable efforts to reunify their family under Iowa Code section 232.102(7) (2016) and (2) the juvenile court should have declined to terminate under section 232.116(3)(c) based on the strong mother-child bond.  On the first issue, we find the DHS made an adequate record showing its reasonable efforts to facilitate visitation while K.S. was serving time at the Iowa Correctional Institution for Women in Mitchellville.  On the second issue, the evidence was not clear and convincing that termination would be detrimental to J.H. because of the closeness of her relationship with K.S.  Accordingly, we affirm the juvenile court's order.[2]

I.     **Facts and Prior Proceedings**

This appeal involves the future of now seven-year-old J.H.  Her mother, K.S., has a history of criminal offenses and drug-related problems.  For instance, K.S. spent time in jail for illegal possession of prescription drugs in April and May 2013.  In November 2013, her probation was revoked and she was incarcerated

---

[1] The order also terminated the parental rights of J.H.'s father, who does not appeal.

[2] We review child-welfare appeals de novo, which means we examine both the facts and law and adjudicate anew those issues properly preserved and presented.  *See In re L.G.*, 532 N.W.2d 478, 480 (Iowa Ct. App. 1995).  The State bears the burden to prove the allegations in its petition by clear and convincing evidence.  *See* Iowa Code § 232.96(2).  The clear-and-convincing standard requires more than a preponderance of evidence but less than proof beyond a reasonable doubt.  *See L.G.*, 532 N.W.2d at 481.  "It means . . . there must be no serious or substantial doubt about the correctness of a particular conclusion drawn from the evidence."  *Id.*

for six months, until May 2014. K.S. also spent ten days in jail in June 2014. When K.S. was incarcerated, she relied on friends and family to care for J.H.[3]

During the summer of 2014, the DHS investigated a claim of child abuse against K.S. involving her supervision of J.H., then four years old, while the mother was abusing prescription pain killers or other illegal drugs. The juvenile court adjudicated J.H. as a child in need of assistance (CINA) in September 2014 but left the child in her mother's care after K.S. completed a substance-abuse evaluation and agreed to treatment and random drug testing. K.S. gave birth to a third child in February 2015.[4]

J.H. was removed from her mother's care in June 2015 when K.S. began serving an indeterminate ten-year prison sentence for obtaining prescription drugs by deceit. J.H. was initially placed with her father, but he was unable to provide her with consistent care. J.H. has been living with the same foster family since February 2016. Her guardian ad litem (GAL) reported J.H.'s verbal skills and school performance have significantly improved during that time. In the GAL's view, J.H.—who has been diagnosed with Attention Deficit Hyperactivity Disorder (ADHD)—has benefited from the calm and structured environment she has experienced in her foster home in Sheldon.

But the distance between the foster home in Sheldon and the prison in Mitchellville (more than 400 miles roundtrip) has made arranging visitation difficult. J.H. had only three visits with her mother in prison—once in January 2016 when a family friend transported her, and twice in the summer of 2016

---

[3] K.S. also had custody of her younger daughter, M.W., who had a different father than J.H. M.W. is now living with her father and is not a subject of this termination case.
[4] That child, B.S., is living with his father and is not a subject of this termination case.

when a caseworker made the trip. In May 2016, the juvenile court continued permanency for six months based on the mother's report that she would likely be paroled in November 2016. At the time of those visits in June and July, K.S. was residing in a halfway program outside the prison walls. But in August, K.S. was returned to the main prison facility after being accused of forging a time sheet, and in October 2016, her request for parole was denied. She was not due for another parole review until March 2017.

The State filed a petition to terminate parental rights on November 3, 2016, and the juvenile court heard testimony on November 29. In an order issued on January 24, 2017, the court terminated K.S.'s parental rights based on Iowa Code section 232.116(1)(f). In K.S.'s petition appealing that order, she does not challenge the statutory ground. In the absence of a challenge, the ground for termination remains undisturbed. *See In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010).

## II. Analysis

### A. Reasonable Efforts

In her petition on appeal, K.S. focuses on reasonable efforts. This concept is key to reuniting families in the child-welfare system. The DHS must make "every reasonable effort to return the child to the child's home as quickly as possible consistent with the best interests of the child." *See* Iowa Code § 232.102(7). The reasonable-efforts requirement "is not viewed as a strict substantive requirement of termination. Instead, the scope of the efforts by the DHS to reunify parent and child after removal impacts the burden of proving

those elements of termination which require reunification efforts." *In re C.B.*, 611 N.W.2d 489, 493 (Iowa 2000).

K.S. bemoans the fact she has had so few visits with J.H. while serving her prison sentence in Mitchellville. K.S. cites *In re S.J.*, 620 N.W.2d 522, 525 (Iowa Ct. App. 2000), for the proposition that a parent's incarceration does not absolve the DHS of its duty to provide reunification services, including visitation if reasonable. Specifically, she criticizes the DHS for failing to make "a complete record at the termination hearing" as to the considerations listed in *S.J.*, 620 N.W.2d at 525 (opining DHS "may wish to consider some or all of the following factors, among others, if applicable: the age of the children, the bonding the children have or do not have with their parent, including any existing clinical or other recommendations concerning visitation, the nature of parenting deficiencies, the physical location of the child and the parent, the limitations of the place of confinement, the services available in the prison setting, the nature of the offense, and the length of the parent's sentence").

K.S. raises an important issue. A parent's ability to regain custody often hinges on the frequency and quality of visitation while the child is placed outside the home. When a parent is incarcerated, the DHS cannot just write off the possibility of visitation without proper investigation and inquiries. *See, e.g.*, *In re R.C.*, No. 16-1131, 2016 WL 4803919, at *4–5 (Iowa Ct. App. Sept. 14, 2016); *In re K.M.*, No. 16-0795, 2016 WL 4379375, at *5 (Iowa Ct. App. Aug. 17, 2016); *In re K.L.P.*, No. 15-1371, 2015 WL 6507840, at *4–5 (Iowa Ct. App. Oct. 28, 2015).

Too often, parents wait until the eleventh hour to demand reasonable efforts. No such delay happened here. K.S. pushed early for the DHS to make

reasonable efforts to facilitate visits with her children at the prison. At a CINA review hearing in April 2016, the juvenile court encouraged the DHS to continue to provide the maximum visitation possible. In response to a motion filed by K.S.'s counsel, the juvenile court issued an order in June 2016, citing *S.J.*, 620 N.W.2d at 525, and directing the DHS to "provide transportation for [J.H.] to visit her mother in prison to the extent transportation services are available" and to "provide gas money to defray the cost of transportation provided by other DHS-approved individuals to the extent such funds are available." But the juvenile court also noted this was not a situation where the DHS "has placed a child in a distant foster home, but rather, it is a case where the child's mother is incarcerated in a distant facility."

K.S. contends the DHS failure to "take more action" after the court's June 2016 order was a denial of reasonable efforts. On this record, we cannot agree. The DHS case manager testified to the agency's endeavors to coordinate visits for K.S. with her three children who lived in three different homes in northwest Iowa. The caseworker made the eight-hour round trip once in June and once in July. The DHS scheduled another trip for August, but it "ended up not being a visitation date" for the prison, and the prison officials "wouldn't make special arrangements" for the DHS. The DHS also had trouble getting a family safety, risk, and permanency worker cleared to enter the prison. After brainstorming on how to facilitate more visits, the DHS approved several different friends and relatives of K.S. to transport J.H. to Mitchellville, but only one family friend had been able to make the trip. M.W.'s father was approved to take both girls to visit, but one time he took only M.W. and another time DHS paid for his gas, but he

ended up not going. The DHS caseworker told the court: "We really have exhausted our efforts" at facilitating visits. The DHS also allowed K.S. to have ongoing telephone and electronic communication with J.H.

While the sparsity of in-person visits between J.H. and K.S. was not ideal, we cannot find it was unreasonable under the circumstances. The geography in this case was daunting. While K.S. did not choose to be incarcerated in Mitchellville, the location of the only women's prison in Iowa, she did commit the crimes that led to her prison term. The question is whether the DHS attempts to arrange visitation were reasonable under the circumstances. *S.J.*, 620 N.W.2d at 525 (observing father's imprisonment at "a distant facility" rendered "any provision of reunification services infeasible"). Here, the DHS did not deny visitation at the Mitchellville prison. The agency was responsive to the juvenile court's June 2016 order and workers made several day-long treks across the state with K.S.'s young children. The DHS also was open to approving safe individuals to transport J.H. to see her mother. The problem was those individuals could not or did not commit to bringing J.H. to the prison on a regular basis. We cannot conclude the DHS violated its statutory mandate to provide reasonable efforts.

### B. Closeness of the Relationship

K.S. next alleges the juvenile court should not have terminated her parental rights because she and J.H. had a close relationship. Section 232.116(3)(c) allows the juvenile court to refrain from terminating parental rights if "[t]here is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child

relationship." This factor is permissive, not mandatory. *See In re M.W.*, 876 N.W.2d 212, 225 (Iowa 2016).

We have no cause to doubt the strong affection K.S. expresses toward J.H. But the record does not support a finding that cleaving J.H. from her mother would be harmful to the child. According to the GAL, J.H.'s ADHD and anxiety have dissipated since she left the chaos and crisis in K.S.'s household for the relative calm and stability in her foster-care placement. The record shows the child's familial identity now lies with her foster family, to the point that she has asked to take their last name. *See* Iowa Code § 232.116(2)(b). Accordingly, we affirm the termination order.

**AFFIRMED.**